UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Robert J. Cavacas,

       Plaintiff,

      v.                                    Civil Action No. 2:12-CV-234

Commissioner of Social Security,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 9, 13)

Plaintiff Robert Cavacas brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying his application for disability insurance

benefits.  Pending before the Court are Cavacas's motion to reverse the Commissioner's

decision (Doc. 9), and the Commissioner's motion to affirm the same (Doc. 13).  For the

reasons stated below, I recommend that Cavacas's motion be DENIED, and the

Commissioner's motion be GRANTED.

## Background

Cavacas was forty-three years old on his alleged disability onset date of

April 1, 2008.  He testified that he completed school through the tenth grade, and

thereafter attended night school.  (AR 39-40, 942.)  He has work experience as an

automobile mechanic, and enjoys repairing mechanical things.  (AR 233, 250-51.)

Cavacas lives by himself in a mobile home. He has two sons in their late teens or early twenties. He testified that he does not get along well with people. On a typical day, he watches television, does light household chores, and cares for his dog. He is able to do activities of daily living independently, but reports that he is unable to do recreational activities.

Cavacas claims to have many ailments and injuries, including a brain injury, double vision, blurry vision, blackouts/seizures, migraine headaches, severe hand dermatitis, leg and knee pain, and groin pain subsequent to hernia repair surgery in 1999. He has been diagnosed with adjustment disorder with depressed mood, alcohol dependence, opioid dependence in reported remission, and cocaine abuse in reported remission. The record suggests that he may have experienced head trauma as a child (*see, e.g.*, AR 222, 920), and has anger management problems and a history of DWI and domestic assault (AR 222-23). Cavacas has apparently had multiple motor vehicle accidents related either to intoxicated driving or loss of consciousness. (AR 947; *see also* AR 920-21.) For example, in February 2010, he claims to have "blacked out" while snowmobiling, causing him to hit a tree (AR 1053), and resulting in serious injuries, including fracture of his pelvis and left leg and severe sprain/rupture of his right knee (*id.*; *see also* AR 711, 716, 907). He had elevated alcohol levels when admitted to the ER after the accident. (AR 665, 1050.) Approximately five months earlier, in September 2009, Cavacas sought medical care for a puncture wound to his hand which he said occurred when he blacked out while drilling. (AR 305.)

In September 2009, Cavacas protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). In his DIB application, he alleged that, starting on April 1, 2008, he has been unable to work due to migraine headaches; dizziness/vertigo; high cholesterol; dermatologic problems with his right hand causing it to peel, split open, and bleed constantly; memory and concentration problems; vision problems including an episode of blindness in 1990; blackouts; depression; numbness in his left leg; and pain in both legs sometimes preventing him from walking. (AR 241.) Cavacas's application was denied initially and on reconsideration, and he timely requested an administrative hearing. The hearing was conducted on June 9, 2011 by Administrative Law Judge ("ALJ") Debra Boudreau. (AR 32-79.) Cavacas appeared and testified, and was represented by an attorney. A vocational expert ("VE") also testified at the hearing.

On June 30, 2011, the ALJ issued a decision finding that Cavacas was not disabled under the Social Security Act from his alleged onset date through the date of the decision. (AR 11-25.) Thereafter, the Appeals Council denied Cavacas's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1-3.) Having exhausted his administrative remedies, Cavacas filed the Complaint in this action on October 10, 2012. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Boudreau first determined that Cavacas had not engaged in substantial gainful activity since his alleged onset date of April 1, 2008. (AR 13.) At step two, the ALJ found that Cavacas had the following severe impairments: dermatitis, migraine headaches, adjustment disorder with depressed mood, alcohol dependence, opioid dependence in reported remission, and THC and cocaine abuse in reported remission. (AR 13-14.) Conversely, the ALJ found that Cavacas's leg pain, high cholesterol, and groin pain were non-severe, given the absence of medical evidence indicating that these impairments resulted in functional limitations. (AR 14.) At step three, the ALJ found that none of Cavacas's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14-16.)

Next, the ALJ determined that Cavacas had the RFC to perform medium work, as defined in 20 C.F.R. § 404.1567(c), with the following specifications:

> [Cavacas] has the [RFC] to perform medium work . . . involving lifting and carrying fifty pounds occasionally and twenty[-]five pounds frequently with standing and walking with normal breaks for six hours in an eight-hour workday and sitting with normal breaks for six hours in an eight-hour workday. [Cavacas] is able to understand, remember and carry out one to three step instructions. [Cavacas] is able to sustain these tasks over a typical workday and workweek in a low stress environment; low stress defined as no intensive social interaction with co-workers and supervisors, but can manage routine social interactions with the general public, co-workers and supervisors and can accept supervision. [Cavacas] is also able to tolerate work place changes in this environment. He can further plan and set goals.

(AR 16-17.) Given this RFC, the ALJ found that Cavacas was unable to perform his past relevant work as an automotive mechanic. (AR 23.) But based on testimony from the VE, the ALJ determined that Cavacas could perform other jobs existing in significant

numbers in the national economy, including kitchen helper, janitor, cafeteria counter supply worker, cleaner/laundry worker, cafeteria attendant, cleaner, marker, mail sorter, collator operator, gate guard, car wash attendant, telemarketer, sorter, and document preparer. (AR 24-25.) The ALJ concluded that Cavacas had not been under a disability from his alleged onset date through the date of the decision. (AR 25.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

I.     **The ALJ Did Not Err in Finding that Cavacas's Syncope and Leg/Knee
       Problems Were Not Severe Impairments.**

Cavacas asserts that the ALJ should have identified his syncope[1] and leg/knee

problems as severe impairments.  The regulations define a "severe" impairment as one

"which significantly limits [the claimant's] physical or mental ability to do basic work

activities."  20 C.F.R. § 404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir.

2010).  The Social Security Administration has described the claimant's burden of

demonstrating a severe impairment as follows:

> [A]t the second step of [the] sequential evaluation it must be determined
> whether medical evidence establishes an impairment or combination of
> impairments "of such severity" as to be the basis of a finding of inability to
> engage in any [substantial gainful work].  An impairment or combination of
> impairments is found "not severe" and a finding of "not disabled" is made
> at this step when medical evidence establishes only a slight abnormality or
> a combination of slight abnormalities which would have no more than a

---

[1] "Syncope" is defined as "[l]oss of consciousness and postural tone caused by diminished
cerebral blood flow."  STEDMAN'S MEDICAL DICTIONARY 1887 (27th ed. 2000).

minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

SSR 85-28, 1985 WL 56856, at *3 (1985). Thus, an impairment that has only a minimal effect on a claimant's ability to perform basic work activities is not severe. *Id.*

### A. Syncope

Although the ALJ did not discuss Cavacas's syncope and related symptoms at step two of her sequential analysis, she did discuss this impairment in subsequent steps, noting as follows: "the medical record documents [Cavacas's] report of blackout spells and migraine headaches of an unclear etiology"; "May 2009 medical records document [Cavacas's] complaint of intermittent blurry vision with impaired concentration"; and "July 2009 medical records document [Cavacas's] report of episodic lapses of attention, impaired concentration and reaction with pain in his eyes." (AR 19.) The ALJ further noted that, despite these complaints, a 1990 head CT scan, 2009 brain MRI, 2009 and 2010 EKGs and EEGs, 2010 echocardiogram, 2009 and 2010 neurological examinations, and 2010 thorough cardiac work-up all showed normal results, thus failing to account for Cavacas's blackouts and related symptoms. (AR 19-20 (citing AR 284, 316, 355, 469, 480-81, 487, 666, 1103, 1143, 1148-50).) The ALJ also observed that Cavacas's headaches were successfully treated with medication. (AR 20 (citing AR 466).)

Cavacas contends that the ALJ should have explicitly stated at step two whether his syncope was a medically determinable impairment, and if so, whether it was a severe impairment. But even assuming the ALJ's failure to discuss Cavacas's syncope at step

two was error, the error was harmless. At step two, the ALJ identified other severe impairments, including dermatitis, migraine headaches, and adjustment disorder with depressed mood, and thus proceeded with the subsequent steps of the sequential evaluation. (AR 13-14.) In those subsequent steps, the ALJ specifically considered Cavacas's allegations of syncope and blackouts, as discussed above. (AR 19-20.) Because Cavacas's syncope was considered during the subsequent steps, any step-two error was harmless. *See Reices-Colon v. Astrue*, No. 12-3013, 2013 WL 1831669, at *1 (2d Cir. May 2, 2013) (unpublished table decision) (finding alleged step-two error harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (noting that ALJ did not err in finding disc herniation non-severe because ALJ identified other severe claims at step two so the claim proceeded though the sequential evaluation and all impairments were considered in combination); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003).

Cavacas argues that there are two objective medical signs or laboratory findings indicating that his syncope was a severe impairment: (1) his "hand injury due to [a] reported black out [sic]" while using a drill; and (2) cognitive deficits reported in a neuropsychological evaluation, including "weakness in psychomotor speed, auditory attention, and impaired memory[,]" as well as "affective distress and fatigue." (Doc. 9 at 10 (citing AR 305, 628).) The ALJ considered this evidence. (AR 20, 22.) With respect to the blackout while using a drill, the ALJ accurately stated that, "a physical examination revealed no evidence of a puncture wound," and that "[Cavacas's] use of a drill is evidence of his physical ability to function." (AR 20; *see* AR 306, 457.) Regarding the

neuropsychological evaluation, the ALJ correctly noted that the physician who administered the evaluation, Dr. Robert Roth, "opine[d] that the results . . . should be interpreted with caution as they likely underestimate the maximal level of [Cavacas's] cognitive abilities." (AR 22; *see* AR 475.) Thus, the ALJ properly addressed the relevant evidence and explained her rationale for not accounting for Cavacas's syncope in her RFC determination.

### B. Leg/Knee Problems

The ALJ also considered Cavacas's leg and knee problems, but found that they did not result in any ongoing mechanical limitations. The ALJ stated: "[T]he medical record is absent objective medical evidence indicating that [Cavacas's] leg pain results in functional limitations." (AR 14.) Substantial evidence supports this finding. (*See, e.g.*, AR 1024, 1192.) Arguing that the record as a whole demonstrates that Cavacas's leg and knee problems were severe, Cavacas cites medical records documenting his 2010 snowmobile accident and resulting knee fracture and other injuries. (Doc. 9 at 11.) But the ALJ reviewed and discussed these records, and properly concluded that they do not indicate any ongoing functional limitations. (AR 14.) *See Britt v. Astrue*, 486 F. App'x 161, 163 (2d Cir. 2012) (claimant's step-two argument failed because he "did not furnish the ALJ with any medical evidence showing how [his] alleged impairments limited his ability to work"). Moreover, the ALJ found that other evidence, discussed below, indicated that Cavacas was not functionally limited and could in fact work (AR 18); that no treating source opined that Cavacas was physically unable to function (AR 23); and

that there were "too many credibility concerns[2] to accept [Cavacas's] subjective reports to his treating providers" (*id.*). Cavacas cites physician assistant Timothy Mello's statement that it would be "reasonable" for Cavacas to obtain a handicap placard, given "his chronic pain and neurologic issues." (AR 1192.) But the ALJ was not required to credit this statement, as the standard for obtaining a handicap placard is not the same as that for receiving social security disability benefits.

At the conclusion of his step-two argument, Cavacas insinuates that the ALJ erred in failing to analyze his alcohol dependence under Listing 12.09, the listing for substance addiction disorders, and failing to determine whether his alcoholism was a contributing factor material to the determination of disability. (Doc. 9 at 12.) Both arguments fail. First, a determination regarding whether a claimant's impairments meet or medically equal a listed impairment "must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary." SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds by* SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991). Cavacas has presented no evidence to demonstrate that he meets or medically equals Listing 12.09. Second, "'substance abuse becomes material to a benefit determination only *after* the claimant is found to be disabled' according to the sequential analysis." *Kinner v. Comm'r of Soc. Sec.*, No. 1:08-CV-1240, 2010 WL 653703, at *3 (N.D.N.Y. Feb. 19, 2010) (quoting *Roy v. Massanari*, No. Civ. 3:01CV306(PCD), 2002 WL 32502101, at *2

---

[2]  The ALJ's credibility assessment is discussed in detail below.

n.3 (D. Conn. June 12, 2002)) (citing 20 C.F.R. § 404.1535(a)) (emphasis added).  Given

the ALJ's decision that Cavacas was not disabled, whether abusing substances or not, the

ALJ was not required to determine whether alcoholism was a contributing factor material

to the determination of disability.

## II.  Substantial Evidence Supports the ALJ's Credibility Assessment.

Next, Cavacas asserts that the ALJ's credibility determination is not based on

substantial evidence.  It is the province of the Commissioner, not the reviewing court, to

"'appraise the credibility of witnesses, including the claimant.'"  *Aponte v. Sec'y of*

*Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation omitted).  If the

Commissioner's findings are supported by substantial evidence, the court must uphold

the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing

*McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).

"When evaluating the credibility of an individual's statements, the adjudicator must

consider the entire case record and give specific reasons for the weight given to the

individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Here, the ALJ determined that Cavacas's statements concerning the intensity,

persistence, and limiting effects of his symptoms "are not credible to the extent they are

inconsistent with the [ALJ's RFC] assessment and a finding of total disability."  (AR 18.)

The ALJ gave specific reasons to support this determination.  First, the ALJ noted that

Cavacas alleged he was unable to use his hands and had difficulty holding a fork,

inhibiting his ability to eat, yet the record demonstrates that he was able to "tinker[]" with

"mechanical things," operate a snowmobile, and use a drill.  (AR 17, 20; *see* AR 42, 47,

232, 305, 665.)  Second, the ALJ pointed out that, although Cavacas claims he became

unable to work due to medical problems starting on April 1, 2008, when his technician

job ended; in fact, the record indicates that the technician job ended due to "lack of

performance and concern of safety for himself and others around him."  (AR 18; *see* AR

241, 257.)  Third, the ALJ noted that, after his technician job ended in April 2008,

Cavacas collected unemployment compensation until early 2009, while at the same time

claiming to be disabled during that period.  (AR 18; *see* AR 196.)  The ALJ stated:

> In order to collect unemployment compensation . . . one must sign
> documents asserting that they are ready, willing[,] and able to work, and
> provide evidence that they have been actively seeking gainful employment.
> The fact that [Cavacas] received unemployment compensation during [the
> alleged disability period] raises a question as to whether [he] was truly
> disabled from gainful work during this time or perhaps merely unemployed.

(AR 18); *see Felix v. Astrue*, No. 11-CV-3697 (KAM), 2012 WL 3043203, at *10

(E.D.N.Y. July 24, 2012) (citing cases) ("Courts in the Second Circuit have held that an

ALJ may consider evidence that the claimant received unemployment benefits and/or

certified that he was ready, willing, and able to work during the time period for which he

claims disability benefits[,] as adverse factors in the ALJ's credibility determination.").

Along the same lines, the ALJ noted that Cavacas enrolled in vocational

rehabilitation and looked for work during the alleged disability period, despite claiming

to be unable to work during that period.  (AR 18; *see* AR 222-24.)  Specifically, a

vocational rehabilitation assessment form recorded that Cavacas was "interested in

training to work in heat and air conditioning," and had beginner computer skills and an

adult diploma.  (AR 222-23.)  A later vocational rehabilitation note stated that Cavacas

was "interested in repairing computers," "want[ed] to look at classes at NH Tech," and taught electronics classes in the past. (AR 224.)

Next, the ALJ defended her credibility assessment by noting that Cavacas entered into a narcotics contract to treat his pain caused by hand dermatitis, but did not appear to use that medication as it was prescribed, and thus his doctor reduced and then terminated the prescription. (AR 19; *see* AR 315, 351-52, 1050 ("not sure [Cavacas] is using [Percocet] wisely"), 1176.) The ALJ further noted that Cavacas's snowmobile accident, which Cavacas attributed to a blackout, may have been related to elevated blood alcohol levels which were recorded in ER notes immediately after the accident. (AR 20; *see* AR 42-44, 1050.) At the administrative hearing, Cavacas testified that he drank only after the accident, explaining that his son dragged his body into his home where he "took a big drink" to dull the pain. (AR 42-44.) The ALJ understandably found this testimony "suspicious at best." (AR 20.) Finally, the ALJ noted inconsistencies in Cavacas's reporting of his substance use. (AR 21.) For example, the ALJ observed that, in an October 2009 neuropsychological evaluation, Cavacas reported drinking a half-gallon of vodka each week, but in a December 2009 psychological examination, he reported drinking only a pint of vodka each week, and December 2010 medical records indicate that Cavacas reported having been sober for years. (*Id.*; *see* AR 476, 1067, 1187.) Further, the ALJ noted that, although Cavacas testified at the administrative hearing that he had not used heroin since he was sixteen or seventeen years old, he reported at a December 2009 psychiatric evaluation that he used heroin "periodically," with the most recent use being eight or nine month earlier. (AR 21; *see* AR 50-51, 638.)

The ALJ also noted that multiple medical providers opined that Cavacas was less than trustworthy. (AR 21-22.) For example, occupational therapist Gregory Morneau stated in a Functional Capacity Evaluation that, "[o]verall test findings, in combination with clinical observations, suggest that considerable question should be drawn to the reliability and accuracy of . . . Cavacas's reports [of] disability." (AR 914.) And psychiatrist Dr. Robert Roth stated in a Neuropsychological Evaluation that the results "should be interpreted with caution as they likely underestimate the maximal level of [Cavacas's] cognitive abilities." (AR 475.)

Considering this and other evidence, the ALJ found that the record "strongly suggests a pattern of exaggerated symptoms and limitations." (AR 23.) The ALJ further found that Cavacas's "reports and testimony" were "contradictory and questionably suspect." (*Id.*) The ALJ concluded: "[T]here are too many credibility concerns to accept [Cavacas's] subjective reports to his treating providers." (*Id.*) Substantial evidence supports this determination, and thus Cavacas's credibility argument fails. *See Stanton v. Astrue*, 370 F. App'x at 234 ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling.") (citing SSR 96-7p, 1996 WL 374186, at *4; *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)).

## III.    The ALJ's RFC Determination Was Proper.

Next, Cavacas argues that the ALJ's RFC determination was not based on substantial evidence because it fails to account for his hand dermatitis, migraine headaches, adjustment disorder, left leg pain, right knee pain, syncopal episodes, and the

side effects of narcotic medication.  (Doc. 9 at 13.)  As discussed above, the ALJ considered Cavacas's syncope and leg/knee problems in some detail, and did not err in finding that these impairments had no more than a minimal effect on Cavacas's ability to perform basic work activities.  With respect to Cavacas's hand dermatitis, the ALJ accounted for the limitations caused thereby.  Specifically, the ALJ noted that, in spite of Cavacas's ongoing dermatitis symptoms, including severe dryness, splitting, bleeding, blistering, and cracking on his right hand; medical records revealed normal range of motion of his hand, wrist, and fingers.  (AR 19 (citing AR 321); *see also* AR 315, 459, 554.)  The ALJ also noted that, despite continued symptoms, a June 2009 medical note recorded that Cavacas's hands were "not bad at present."  (AR 19 (citing AR 441).)  Other evidence in the record demonstrates that Cavacas's hand dermatitis was not consistently active and did not affect his range of motion.  (*See, e.g.*, AR 306, 351, 451, 1069.)  Further, the ALJ noted that, despite Cavacas's allegations about limited manual dexterity due to his hand dermatitis, he was able to tinker on machines and use a drill. (AR 17, 20; *see* AR 232, 305, 457.)

Cavacas asserts that the ALJ should have accounted for his headaches in the RFC, but the ALJ did consider them, finding that they constituted a severe impairment but that medication helped reduce their severity.  (AR 13, 20.)  Cavacas cites no evidence demonstrating that these headaches limited his ability to work, and a November 2009 medical record documents that he "d[id] not wish to p[u]rsue treatment" of his headaches at that time.  (AR 460.)  Likewise, there is no evidence demonstrating that either Cavacas's adjustment disorder or the side effects of narcotics limited Cavacas's ability to

work.  With respect to the narcotics, as noted earlier, the record indicates that Cavacas

did not consistently use the narcotic medication prescribed to him, resulting in a

reduction of his prescription.  (*See* AR 315, 351-52, 1050, 1176.)  *See Holley v.*

*Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (holding that noncompliance may serve

as a basis for dismissing a claimant's subjective complaints); 20 C.F.R. § 404.1530(b)

("If you do not follow the prescribed treatment without good reason, we will not find you

disabled.").  Regarding Cavacas's adjustment disorder, although the ALJ found it to be a

severe impairment, she gave "great weight" to agency consultant Dr. William Farrell's

opinion that Cavacas had only mild restriction in activities of daily living; was able to

follow one-to-three step instructions; could sustain sufficient concentration, persistence,

and pace for two-hour blocks of time; and could manage routine interactions with the

general public and coworkers.  (AR 17, 22 (citing AR 644-47).)  As discussed below, the

ALJ properly explained her decision to heavily weigh Dr. Farrell's opinion.

Substantial evidence supports the ALJ's determination that Cavacas was able to

undertake a variety of physical tasks, and it is clear that the ALJ took into consideration

Cavacas's limitations by tailoring the RFC to allow for only medium work with

restrictions, including a "low stress environment."  (AR 17.)  *See Prince v. Astrue*, 490 F.

App'x 399, 400-01 (2d Cir. 2013).  The ALJ considered the record as a whole in

determining Cavacas's RFC, *see* 20 C.F.R. § 404.1545(a)(1) (ALJ must assess claimant's

RFC "based on all the relevant evidence in [the] case record"), and properly determined

the RFC in conjunction with assessing Cavacas's credibility, *see Poppa v. Astrue*, 569

F.3d 1167, 1170-71 (10th Cir. 2009).  As the Tenth Circuit explained:

The regulations require that an ALJ's RFC be based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints. Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined.

*Id.* (citations omitted); *see also Sitsler v. Astrue*, 410 F. App'x 112, 120 (10th Cir. 2011)

(citing *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009)) ("A proper determination

of the weight to be given claimant's subjective claims of pain and other symptoms

underlies a proper finding regarding his RFC.").

## IV.  Substantial Evidence Supports the ALJ's Step-Five Finding that Cavacas Could Perform Work Existing in Significant Numbers in the National Economy.

Cavacas asserts that, because the ALJ's RFC determination did not account for all

his limitations, the hypothetical questions posed to the VE were improper, leading to an

erroneous step-five finding.  (Doc. 9 at 15.)  Given that the ALJ's RFC determination was

proper, this argument lacks merit.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir.

1983) (where substantial evidence supported the assumption upon which the VE based

his opinion, that opinion "satisfied the [Commissioner's] burden of showing the existence

of alternative substantial gainful employment suited to [the claimant's] physical and

vocational capabilities").

## V.  Treating Source Opinions

Finally, although not argued in his motion and therefore not addressed in the

Commissioner's responsive motion, Cavacas briefly argues in his Reply that the ALJ

failed to adequately weigh the treating source opinions.  (Doc. 16 at 3.)  Specifically,

Cavacas asserts that, pursuant to 20 C.F.R. § 404.1527(c)(2), the opinions of "treating"

specialists Drs. Richard Root and Robert Roth should have been given more weight than the opinions of non-examining agency consultants Drs. Francis Cook and William Farrell. (Doc. 16 at 3.) But the record reveals that Dr. Roth was hardly a "treating" provider; he appears to have seen Cavacas on only one occasion, in October 2009, when he administered a neuropsychological examination. (AR 474-79). Thus, his opinion does not rise to the level of that of a "treating physician." *See Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.") (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (a physician who examined a claimant only "once or twice" did not see the claimant regularly and thus did not develop a physician/patient relationship with him). Although Dr. Root, on the other hand, treated Cavacas on multiple occasions (*see, e.g.*, AR 636-40, 692-93, 901-05, 1010-14), the only opinions made by him were made in his first two meetings with Cavacas (AR 636-40, 692-96). Because there was no ongoing treatment relationship at that time, the ALJ was not required to afford extra weight to these opinions. *See Petrie*, 412 F. App'x at 405.

Cavacas is correct that, in general, the opinions of non-examining consulting physicians, such as Drs. Cook and Farrell, have less value than the opinions of examining physicians such as Drs. Roth and Root. However, the regulations do not require that

more weight be given to the opinions of examining physicians in every case: the opinions of non-examining agency consultants may override those of examining or treating physicians when the former are supported by the record and the latter are not. *See* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Mongeur*, 722 F.2d at 1039 ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citation omitted); 20 C.F.R. § 404.1527(e)(2)(i) (state agency medical consultants are "highly qualified physicians . . . who are also experts in Social Security disability evaluation").

Here, the ALJ engaged in a detailed and proper analysis and comparison of the opinions of Drs. Root, Roth, Cook, and Farrell, and Cavacas fails to point out any error. The ALJ found that the opinions of agency consultants Drs. Cook and Farrell were entitled to great weight because they were formulated based on a thorough review of Cavacas's treatment history and were consistent with the record as a whole. (AR 21, 22.) In contrast, the ALJ gave limited weight to the opinions of examining physicians Drs. Root and Roth because their validity was questionable. The ALJ explained that Dr. Roth himself stated in his evaluation that the results "should be interpreted with caution as they likely underestimate the maximal level of [Cavacas's] cognitive abilities" (AR 22 (citing AR 475)); and Dr. Root noted in his own July 2010 assessment that both the October 2009 and July 2010 testing he performed on Cavacas revealed "lack of optimal effort"

(AR 23; *see* AR 1109).  These were proper facts for the ALJ to consider in assessing these medical opinions, and substantial evidence supports the ALJ's allocation of weight thereto.

Finally, Cavacas argues that the ALJ improperly analyzed the opinion of occupational therapist Gregory Morneau, who administered a Functional Capacity Evaluation in November 2010.  (AR 913-41.)  But again, Morneau himself found that "[o]verall test findings, in combination with clinical observations, suggest the presence of variable levels of physical effort on Mr. Robert Cavacas's [b]ehalf."  (AR 927.)  Morneau explained that Cavacas "can do more physically at times than was demonstrated during this testing day."  (*Id.*)  Given these findings, Morneau concluded that, "considerable question should be drawn to the reliability and accuracy of Mr. Robert Cavacas's reports [of] disability."  (AR 914.)  The ALJ correctly acknowledged these findings and conclusion (AR 21-22), and thus gave "little weight to the physical findings documented in Mr. Morneau's evaluation."  (AR 22.)  Cavacas fails to point to any error in this analysis.

## Conclusion

For these reasons, I recommend that Cavacas's motion (Doc. 9) be DENIED, the Commissioner's motion (Doc. 13) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 2nd day of July, 2013.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service
thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties,
written objections which shall specifically identify those portions of the Report and
Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections
"operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y
of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).